# ORPHANS' COURT OF BALTI-MORE CITY.

Filed August 30, 1901.

IN RE. THE ESTATE OF SARAH A. C. SEAVER, DECEASED.

*George R. Willis* and *Joseph C. France,* attorneys for caveators.

*Wm. Pinkney Whyte,* attorney for caveatees.

### DISSENTING OPINION.

O'BRIEN, J.—

Sarah A. C. Seaver died April, 1900, in the eighty-third year of her age. The will in contest was made December, 1898. A previous will, a copy of which is in the evidence, was made in May, 1898. Miss Seaver had all through her life been recognized by her friends and acquaintances as a woman of culture and refinement, and in her later years as a bright, intelligent and courteous person, affable and kind to her friends, and very capable in transacting ordinary business affairs. Up to her last illness she retained a capacity for intelligent conversation, remarkable for one of so advanced an age. In the middle years of her life she and her sister received their support from their brother. The sister died in 1888, and the brother died in 1896, leaving ample property to his surviving sister, the testatrix, which was her support during the remaining years of her life, and is the subject matter of the will in contest. The property left her by her brother mainly consisted of lands in New Jersey, from which she derived a net income of from $700 to $800 per year; her residence on Calhoun street, worth $1,200; and at the time of making the will of December, 1898, about $2,800 in the Savings Bank, and her household furniture.

Whilst no question is before us in reference to the will of May, 1898, a fair inference from all the testimony in the case is that there appears no ground upon which it could be at-tacked. Up to that time there is an almost unanimous concurrence of opinion that the testatrix exhibited mental capacity to execute a valid deed or contract. Therefore, whatever absence of mental capacity, if any, existed at the time of the will of December, 1898, it must have supervened after May, 1898. The evidence establishes that after correspondence with Mr. Condit, the testatrix's New Jersey agent and attorney, in which there was an expression of opinion in regard to her leaving the bulk of her estate to certain relatives, without constraint of any kind, and in the free exercise of her own will and judgment she executed the will of May, 1898, bequeathing all her property, less some few bequests, to her relatives named in said will; it appearing that said bequests were in harmony with her affections, as is made evident by her letter to Mrs. Gordon in 1897, and the character of her mind in bestowing her regard on those of her blood, further evidenced by the warmth of friendship for Mrs. Ruth Ould, of very distant kindred. The conclusion is manifest that at that date, May, 1898, her will then executed was in conformity with her opinions, and with a proper regard for those who might well be the objects of her bounty. It appears that for some time prior to 1898, her state of health required the constant attention of a capable nurse, and that in the latter part of the same year, she exhibited signs of gradual mental decay which led many of the witnesses to believe she was of unsound mind, yet it is unquestioned that she continued through 1898 and 1899, capable of intelligent conversation with her friends, and was able to transact the ordinary business affairs of her life.

The only issue in reference to which evidence was offered is that of mental capacity. In considering that question we have the testimony of a number of witnesses. Those who signed the will as witnesses are by the law always allowed to give their opinion, notwithstanding their obvious incompetency in many cases, from the fact that they are strangers or have little or no knowledge of the testator.

The rule of law, as established by the decisions of the courts and but lately enforced by our Court of Appeals in the Berry case, applicable to witnesses is:

"It ought to appear that the witness had an opportunity of forming a rational opinion, and the facts deposed to by him ought to be such as in some manner to indicate the mental incapacity of the testator, and to furnish to the witness rational ground for an opinion on that subject. The impression made upon the mind of the witness by the conduct, manner, bearing, conversation, appearance and acts of the testator in various business transactions for a long series of years is not mere opinion, it is knowledge.

It is not strictly accurate to say that a non-expert witness other than a subscribing witness, may give his opinion as to a testator's mental capacity, though usage has sanctioned the expression. If he has the means of knowing what that mental condition is, then, after disclosing those means, so as to show, both that he possesses them, and that they are adequate, he may state the result, not as opinion, but as knowledge, precisely as he may do when questions of personal identity or of handwriting are involved.

There must be a basis shown for the formation of a rational conclusion which is not a mere conjecture but is knowledge. Hence, if that basis is trivial or insufficient, or does not furnish in the judgment of the court, an adequate ground to support such a conclusion as amounts to knowledge, the witness should not be permitted to express any conclusion at all."

Judged by this rule, the *opinions* of most of the witnesses are worthless and should not be considered in enabling us to arrive at a correct conclusion as to the mental capacity of the testatrix at the time of the execution of the will of December, 1898.

Schumacher, a witness to the will, aside from his legal capacity as such, gives no testimony that can be relied upon. He never had any transactions with her, and had no conversation with her for years.

Smith, witness to the will, had no conversation with her.

Walsh, a witness to the will, was evidently of the opinion that the testatrix had not mental capacity to make the will he witnessed. He had had business with her and aside from his legal capacity as a witness to the will comes within the rule hereinbefore quoted

from the Berry case, as qualified to give an opinion.

A brief review of the other witnesses shows, that Mrs. Ould had known her many years, visited her frequently, had business transactions, was interested in her affairs in the latter part of 1898, believed her incapable to make the will of December, 1898.

Dr. Weiner, her physician for thirty years, says that she was of unsound mind in December, 1898.

Miss Friedly, who comes within the rule, believes that she was competent.

Mrs. Lyon saw her very seldom for five years, and although testifying to her mental competency, was possessed of but little knowledge of the condition of her mind, and her opinion is of little value.

Mr. Kyper testifies to a business transaction of September, 1899, which proves that she still preserved sufficient knowledge and acumen to attend to money matters, to which she had been long accustomed; a condition which tends to prove but by no means establishes general soundness of mind. Her acuteness in routine affairs of business might well remain, notwithstanding the most serious impairment of her mental faculties, as all experience with the insane demonstrates.

The testimony of Knatz is of like character *and of* inconsiderable weight in determining the question of capacity in December, 1898.

Mr. Lyon had no knowledge of or intercourse with the testatrix for three years, until the night the will was made. She then was as bright as a button, discoursed fluently. His opinion was from that interview that she was mentally capable.

James W. Denny, the attorney who made the will, saw the testatrix but once, the night the will was written and executed. He found her intelligent, conversational, affable and courteous, and notwithstanding certain incidents hereinafter commented on believed her to have a high degree of mental capacity. Under the rule in the Berry will case, Mr. Denny's opinion was not based on facts amounting to knowledge, which would entitle his opinion to much weight.

If a decision as to the mental capacity of the testatrix in December, 1898, was to be made from the opinions of

the witnesses, one could hardly refrain from the observation that it, the will, was only supported by those who are directly interested in sustaining it, several of whom are the residuary legatees, and would thus secure the bulk of the estate.

Leaving the hazy atmosphere of opinion and entering the domain of facts, we are confronted with many contradictions; but it is not difficult to sift the chaff from the wheat and discover from the evidence the true condition of the mind of the testatrix at the time of the execution of the will contested. The chain of evidence is complete that from the summer of 1898 the testatrix gradually became feebler in body and health and betrayed symptoms of an impaired mind. Her inability to remember ordinary matters, except after frequent reminders, was remarked by her friends and neighbors who visited her, a neglect of her personal comforts and necessities, so unlike her former care and cleanliness; a disquiet concerning her financial situation and apparent want of intelligence of her means of support, despite her constant correspondence and regular receipt of funds from her attorney and agent in New Jersey, are facts to be rationally considered. In themselves they may cause suspicion, but standing alone they fairly might be attributed to the debility of mind which is the usual accompaniment of old age.

But more important facts bearing upon her mental condition were clearly established, notwithstanding the opinions of several witnesses that it was only a weakness or lapse of memory. The almost constant belief of the testatrix that her brother, who died in 1896, was still alive and her expectation of hearing from him and receiving a visit from him had so strong a hold on her mind that she wrote the letters offered in evidence. Her conversations with Mrs. Lyon, as detailed in the evidence of that lady, of her lessened regard (without due cause or reason) for Dr. Wiener, who had been for many years in the days of her poverty her constant attendant without charge; her sudden determination to make another will, cutting him off from the meagre sum allowed him in the will of May, 1898; her also sudden change of opinion regarding her relations on the plea that it was always her brother's wish that they should have none of his money, a plea utterly unsupported and in direct contradiction of her desires of six months previous; her statements that she had regularly paid her nurse, Miss Friedly, which is shown to have been untrue, and her later false charges that Mrs. Lyon had surreptitiously gotten her papers, and her letter to that lady demanding their return, are facts conclusive of a failure of intellect, an aberration of mind utterly at variance with mental capacity.

The decision in the Berry will case is directly in point.

Judge McSherry, discussing the facts in that case, says:

"A misconception may be either a mistake or a delusion. Quoting Dr. Hill, 'If there was no foundation for the misconception, it was a delusion, and all delusions are insane.' A misconception is thus distinctly and unqualifiedly treated as synonymous with a delusion, and the existence of delusions is evidence of the absence of mental capacity."

Whatever may be thought of the delusions that led the testatrix to make false statements concerning Dr. Wiener which justified her in changing her affection for him and her gratitude for the friend who administered to her and her sister for so many years of their poverty, or concerning Miss Friedly, who had nursed her when affected with disease, described in the evidence, without pay; it cannot be questioned that the delusion of her brother being alive, to be supplemented in a few months by the delusion that her sister was living and occupying her room above stairs, was of that character which Judge McSherry refers to when he says: "The existence of which is evidence of the absence of mental capacity."

But the question how far those delusions affected her capacity to make the will of December, 1898, is a necessary subject of inquiry. Referring to the delusion of her brother still living, and her belief that he desired none of his money to go to relations, and her anxiety to make a will to carry out her new ideas concerning the relations and Dr. Wiener, it seems clear if she was acting under delusions which controlled her mind so as to lead her to make bequests directly contrary to those made by the will of May, 1898, that she had not a sound and disposing mind.

It will be observed that I give full credit to the evidence of Mrs. Lyon. I am disposed to this view of her testimony notwithstanding the able argument of counsel for the caveators that the will of December, 1898, was made under the undue and controlling influence of Mrs. Lyon. Mrs. Lyon's testimony, leaving out of view her opinions, most amply sustains the fact that the testatrix labored under misconceptions amounting to delusions of an insane character, and giving like credit to the other witnesses, delusions concerning Mrs. Lyon herself, going to the extent of charging her with having intimidated her and forced her, the testatrix, to make the will. The argument of the counsel of the caveatees that all testimony showing that the testatrix's calumnies of Mrs. Lyon is false, weak and inconclusive, and the dilemma confronts them,—either Mrs. Lyon is false in her statements and unworthy of belief, or she testified truthfully and the testatrix's charges of her intimidation and purloining her papers being untrue were insane delusions. I am of opinion that the latter view is in harmony with the other facts of the case.

I come now to a consideration of the evidence of the circumstances surrounding the making of the will. The testatrix is shown to have made preparations in an intelligent manner and at the time was unusually bright and entertaining, but apparently unconscious of the occasion to such an extent that Mr. Denny had to call her attention to the object of. the presence of her friends, Mr. and Mrs. Lyon. His statement of a general character of the conversation with the testatrix would impress one that after being reminded of her desire to make a will, the testatrix understood the purpose in view and was appreciative of all that was important to make a disposition of her property. The fact is that Mr. Denny had no possible reason, from her courteous reception of him, and having no knowledge, information or suspicion of her mental infirmities, to have any other opinion. On cross-examination of Mr. Denny, his admissions not only qualify but completely destroy the effect of his earlier statements. It is clear from his evidence that, *first, she had little* or no knowledge of her property in New Jersey, and had no conception of its value; she was unaware of the value, or of the fact that she

owned the house she resided in and its contents, nor did she have a proper idea of the extent of her funds in bank; *second, that being possessed* of the idea that she must cut off Dr. Wiener and her relations, she had not thought of the disposition of any of her property except the small amounts given to her friends who, with the exception of Miss Friedly, had no possible claim; *third, if she had any* sanity of mind at all, she believed that these friends had been given most generously, donations in all respects· equal to the extent of her affections for them, and in the case of Miss Friedly, as she deemed ample payment for her years of nursing and care; *fourth, that without* thought, consideration, or judgment and in a state of mind having no rational conception of what she was disposing of, she gave to the four persons to whom she had already given small bequests, the entire balance of her estate, worth over $12,000. The evidence of Mr. and Mrs. Lyon fully corroborates Mr. Denny's admissions, and establishes beyond doubt, that notwithstanding the remarkable intelligence, culture, refinement and acute knowledge of money matters possessed generally by the testatrix, she, at the time of the execution of the will of December, 1898, *did not have* what the law of Maryland requires, as laid down in Higgins et al. vs. Carlton et al., "*A sufficient capacity at the time of the execution of the will to make a disposition of her estate with judgment, and understanding in reference to the amount and value of her property and the relative claims of the different persons who should be the objects of her bounty.*"

If anything was wanting to demonstrate her mental incapacity to make the will, it is amply ·supplied in the testimony of Mr. Walsh, that at the very time she signed it she was not fully conscious of her act and did not ·remember making the previous will executed in May, and the next morning had no intelligent comprehension of her act of the previous evening.

Mr. Walsh was a disinterested witness, and give his testimony in a distant State, and not under the incitement of a court trial with a small fortune at hazard. The testimony of Miss Friedly and Cephas Johnson to the same effect, that the testatrix, the next day after the naturally excit-

ing occasion of will making, was in a bewildered state of mind, and regarded the proceedings over night as a sensational drama. Mr. Denny testified that in conversation immediately after the will had been executed she spoke of her deceased brother as being alive.

The testatrix's manner and conversation *cursorily* observed gave evidence of intelligence, but in the light of the indisputable facts given in evidence of her mental incapacity before at the time of and after the will was made, I must dissent from the opinion of my colleagues, and I, therefore, conclude that the testatrix had not in December, 1898, a sound and disposing mind, memory and understanding, and that the will is void.